1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
2                       GALVESTON DIVISION

3

    ROBERT L. APTER, ET AL      §    3:22-CV-00184
4                               §
    V.                          §    10:32 A.M. TO 11:39 A.M.
5                               §
    DEPARTMENT OF HEALTH AND     §
6   HUMAN SERVICES, ET AL       §    NOVEMBER 1, 2022

7                  HEARING ON MOTION TO DISMISS
                BEFORE THE HONORABLE JEFFREY V. BROWN
8                      Volume 1 of 1 Volume

9   APPEARANCES:

10  **FOR THE PLAINTIFFS:**
    Mr. Jared Kelson
11  Mr. Trent McCotter
    Boyden Gray and Associates
12  801 17th Street NW
    Suite 350
13  Washington, DC 20006
    (202) 955-0620
14
    **FOR THE DEFENDANTS:**
15  Mr. Isaac Belfer
    DOJ-CRT
16  Civil Division, Consumer Protection Branch
    P.O. Box 386
17  Washington, DC 20044-0386
    (202) 305-7134
18      and
    Mr. Oliver McDonald
19  DOJ-CIV Consumer Protection Branch
    450 Fifth Street, NW
20  Room 6400-South
    Washington, DC 20530
21  (202) 305-0168

22  Court Reporter:
    Laura Wells, RPR, RMR, CRR, RDR
23  601 Rosenberg, Suite 615
    Galveston, Texas 77550
24
    Proceedings recorded by mechanical stenography.
25  Transcript produced by computer-assisted transcription.

1                    **VOLUME 1 OF 1 VOLUME**
                **(Hearing on Motion to Dismiss)**
2                                                    **Page**
     **November 1, 2022**
3
     Announcements....................................    3
4    Argument by Mr. Belfer...........................    5
     Argument by Mr. Kelson...........................   16
5    Argument by Mr. Belfer...........................   43
     Argument by Mr. Kelson...........................   54
6    Ruling of Court..................................   59
     Reporter's Certificate...........................   59
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **PROCEEDINGS**

2               **(Call to order of the Court.)**

3          THE COURT:  All right.  One case on the Court's

4     docket this morning.  It's in Cause Number 3:22-CV-184,

10:32:27   5     Robert L. Apter v. United States Department of Health and

6     Human Services and others -- Robert Apter and others v.

7     Department of Health and Human Services and others.

8          Will the attorneys make their appearances, please.

9     Plaintiff first.

10:32:42   10          MR. KELSON:  Jared Kelson for plaintiffs, Your

11    Honor.

12          THE COURT:  Good morning.

13          MR. McCOTTER:  Trent McCotter for plaintiffs,

14    Your Honor.

10:32:49   15          THE COURT:  Good morning.  Welcome.

16          MR. BELFER:  Good morning, Your Honor.  Isaac

17    Belfer for the government.

18          THE COURT:  Great.  Good to have you.

19          MR. McDONALD:  Good morning.  Oliver McDonald for

10:32:57   20    the government.

21          THE COURT:  Great.  And I understand we have some

22    folks on the phone who are listening in, and I think

23    George has already asked for you to mute your phones a

24    couple of times and there are people who have not muted

10:33:09   25    their phones and we're going to cut the thing off if --

1   we're getting a lot of feedback here in the courtroom.

2   Please mute your phones if you want to listen in.

3        All right.  I have read the briefing in the case.  I

4   appreciate y'all coming down this morning.  Sorry the

10:33:30  5   weather is not ideal.  This is our first time back in our

6   courtroom since -- in a few months.  So it's nice to be

7   back in our regular courtroom.

8        I have a series of questions I want to ask you all;

9   but I would like to get kind of a general argument from

10:33:50  10   both sides first, recognizing that I am familiar with the

11   case and the briefing.  If there is anything that y'all

12   want to add to the briefing you have already provided to

13   the Court, this is your opportunity to do it; and then,

14   we'll discuss some of the questions that I have for both

10:34:07  15   sides.

16        So it's the government's motion, if you would like to

17   get us started.

18             MR. BELFER:  Can I come up here?

19             THE COURT:  You can argue from there or from

10:34:17  20   right here in front of the bench, whichever you prefer, as

21   long as you are speaking into a microphone.

22             MR. BELFER:  I'll try up there.

23             THE COURT:  All right.  Come on up.  I'm sorry.

24   Hold on a second.

10:34:37  25        George, can you just mute them so we don't get --

Argument by Mr. Belfer

             1          CASE MANAGER:  Yes.  I can do that.

             2          THE COURT:  Just so we don't -- or just turn the

             3   volume down so we don't hear them.

             4          CASE MANAGER:  Yeah.  I lowered the volume.

10:34:47     5          THE COURT:  I'm sorry.  Go ahead.

             6          MR. BELFER:  After receiving multiple reports of

             7   patients requiring medical attention, including

             8   hospitalization, after self-medicating with ivermectin

             9   products intended for livestock, FDA made several public

10:35:02    10   statements on social media and on its website written in

            11   informal conversational language warning the public about

            12   certain risks of using ivermectin products to treat

            13   COVID-19.

            14          These statements included non-binding recommendations

10:35:15    15   to consumers who could purchase animal-use ivermectin over

            16   the counter not to take ivermectin to treat COVID-19, but

            17   the statements did not say that doctors could not

            18   prescribe ivermectin to treat COVID-19 or that consumers

            19   could not take ivermectin for that purpose.

10:35:31    20          Instead, they said that, "If your healthcare provider

            21   writes you an ivermectin prescription, fill it through a

            22   legitimate source such as a pharmacy and take it exactly

            23   as prescribed."

            24          Because the statements simply provided nonbinding

10:35:44    25   recommendations to consumers, they are not rules and,

Argument by Mr. Belfer                                        6

1   thus, are not agency action as required for waiver of

2   sovereign immunity.  They did not bind the public or FDA,

3   did not interpret any substantive rules, and did not set

4   agency policy.

10:35:57   5       The statements are also not final agency action.  They

6   do not mark the consummation of FDA's decision-making

7   process because they do not state FDA's final position on

8   the use of ivermectin to treat COVID-19 but instead

9   present FDA's tentative recommendations based on currently

10:36:14   10  available data.

11      They also do not have legal consequences for anyone

12   but simply provide nonbinding recommendations to

13   consumers.

14      Plaintiffs have also failed to meet their burden to

10:36:24   15  show standing.  The amended complaint alleges five

16   injuries to plaintiffs and three injuries to their

17   patients.

18      Regarding injuries to the plaintiffs, the amended

19   complaint alleges:  First, that there was interference

10:36:36   20  with their ability to practice medicine; second, that they

21   were referred to state medical boards; third, that they

22   were forced to resign from their jobs; fourth, they were

23   subjected to public ridicule; and fifth, that patients

24   delayed seeking treatment from plaintiffs.

10:36:51   25      And then with regard to injuries to their patients,

Argument by Mr. Belfer

1  the amended complaint alleges three injuries:  First, that

2  pharmacists refused to fill patients' ivermectin

3  prescriptions; second, that insurance companies refused to

4  pay for those prescriptions; and third, that patients

10:37:06  5  delayed seeking treatment from plaintiffs or delayed

6  taking ivermectin.

7       As discussed in our briefs, many of those injuries are

8  not an adequate injury in fact.  Plaintiffs have also not

9  shown that any of their claimed injuries are fairly

10:37:22  10  traceable to defendants' statements because their injuries

11  were caused by independent third-party conduct that was

12  not a predictable response to those statements.

13       For example, it was not predictable that plaintiffs'

14  employers would punish them for prescribing ivermectin to

10:37:33  15  treat COVID-19 when the statements themselves acknowledged

16  doctors' discretion to do just that.

17       Furthermore, plaintiffs have not shown that the

18  requested relief would likely redress their claimed

19  injuries.  Many organizations, in addition to FDA, have

10:37:46  20  recommended against taking ivermectin to treat COVID-19;

21  and plaintiffs have not shown that removing just the cited

22  FDA statements would likely cause the third parties that

23  allegedly injured them to reverse their past decisions.

24       Finally, plaintiffs have failed to state a claim

10:38:01  25  because they did not present their issues in the amended

Argument by Mr. Belfer

1    complaint to FDA.  They thereby deprived the agency of the

2    opportunity to consider their issues in the first instance

3    and prevented the agency from creating an administrative

4    record that addressed those issues.

10:38:15   5    So I would be happy to talk about any further issues

6    but I think that's a good summary and I'll answer any

7    questions the Court has.

8          THE COURT:  Okay.  All right.  First of all, just

9    a couple of things on -- well, the -- you mentioned the

10:38:32  10    informational conversational tone of the social media

11    statements.  To me, that seems like part of the problem in

12    that those statements don't include the qualifier

13    statements that the article has that was referred to; and

14    I think those -- I think as far as reputational harm goes,

10:39:04  15    it's the social media statements are what bother me the

16    most.  And I don't even know where I'm going with the

17    question here.

18          But can you understand my concern with that?  I mean,

19    it's like was the purpose of those statements really to

10:39:20  20    advise patients not to self-medicate with ivermectin?  The

21    social media -- the social media comments in particular.

22          MR. BELFER:  Right.  So I don't think the record

23    shows the FDA's motivation for those statements in

24    particular.  We do know that the article was motivated by

10:39:43  25    people self-medicating with animal-use ivermectin and

Argument by Mr. Belfer

1   requiring hospitalization.  So we do know that that was

2   part of FDA's motivation.

3       And so I think with regards to the social media posts,

4   which are two tweets and an Instagram post, those

10:39:58   5   statements were clearly aimed at consumers.  As we

6   discussed, they used this conversational language, you

7   know, "Hold your horses.  You are not a horse.  You are

8   not a cow."  Information like that.

9       So clearly this was aimed at consumers.  It was not

10:40:13   10   aimed at medical professionals or hospitals; and it was

11   not predictable that hospitals or insurance companies or

12   pharmacies would act based on these statements, let alone

13   it was not predictable that they would respond to these

14   statements by firing plaintiffs.

10:40:28   15       And indeed, the tweets linked to the article.  And so

16   if you look at the tweets, they include the link to the

17   article.  And so it was predictable that if you include

18   the link to the article, people, you know, will click on

19   the link and will see the full article, which includes

10:40:46   20   that disclaimer that if your doctor writes you a

21   prescription, you should fill it exactly as prescribed.

22       So in terms of the standing analysis when you are

23   asking was it predictable that third parties would take

24   the actions that they took based on the cited statements,

10:40:59   25   you know -- and it's plaintiffs' burden to show that; and

Argument by Mr. Belfer

1   plaintiffs have not met that burden because, first of all,

2   the tweets included links to the article and those

3   statements were clearly -- they were aimed at consumers,

4   and they were not the sort of statements FDA would make to

10:41:20   5   influence, for instance, hospitals or, you know,

6   pharmacies or insurance companies.  Right.

7       So I think for those reasons plaintiffs have not shown

8   -- certainly have not shown traceability regarding those

9   statements.

10:41:33   10       And also, they have not shown redressability regarding

11   those statements because, as we discussed in our brief,

12   many organizations, in addition to FDA, have made public

13   statements advising against the use of ivermectin to treat

14   COVID-19.

10:41:45   15       So, you know, even if FDA's tweets and other

16   statements were taken down, there would still be many

17   statements by other organizations, like the World Health

18   Organization and Merck, which makes one of these drugs,

19   and CDC and NIH, all advising against the use of

10:41:58   20   ivermectin to treat COVID-19.

21       And so it would not -- plaintiffs have not shown that

22   they would -- that the third parties would likely undo

23   their actions, reverse their past decisions, given that

24   all those statements by other parties are still out there.

10:42:14   25       THE COURT:  Okay.  It's not just common sense

Argument by Mr. Belfer

1  that it would be predictable that state boards would react

2  to statements by the FDA in ways that they did?

3       MR. BELFER:  So state board -- no state board has

4  made any discipline against plaintiffs.  There is an

10:42:30  5  allegation that Apter was referred to a state medical

6  board, but that's all we have.  There is no indication

7  there has been any action whatsoever by that state medical

8  board and it's speculative, you know, if or when that

9  medical board will take any action.  And as we discussed

10:42:46  10  in our brief, merely being referred to a state medical

11  board is not adequate injury in fact.  So, you know,

12  again, it's purely speculative, you know, if or when that

13  state medical board will act and then what weight it might

14  give to that -- to that statement.

10:42:59  15       Importantly, it wasn't the state medical board that

16  cited the FDA statements.  It was some unidentified third

17  party that included the statement in the referral to the

18  state medical board.

19       So, you know, I think to close the loop on that,

10:43:11  20  essentially, you have this simple allegation after it was

21  referred for discipline but, you know, we don't know if or

22  when the state medical board will act on the referral.

23       And, you know, if and when it does ultimately act, we

24  don't know to what extent it will give the FDA statements

10:43:28  25  any -- any weight and the fact that there are all these

Argument by Mr. Belfer

1   statements by other organizations, like the World Health

2   Organization and CDC and NIH, indicating that there is not

3   a showing that simply taking away the FDA statements would

4   make any difference or would cause them to act any

10:43:42   5   differently.

6          THE COURT:  Okay.  And you are getting into

7   redressability here.  The plaintiffs say that I should

8   presume redressability at this stage.  Are you aware of

9   any cases in which a motion to dismiss was granted on a

10:43:54   10   failure to show redressability?

11          MR. BELFER:  Again, off the top of my head, I

12   can't.  I can't think of one right now.  But we do cite a

13   case in our brief.  I believe it's the *Renal Physicians*

14   case from the, I think, DC Circuit, which says that you

10:44:10   15   can't presume redressability simply based on traceability.

16          So even if it's true that the government's statements

17   caused a third party to make a certain action, you

18   don't -- you can't presume redressability because it's

19   possible that some independent factor is holding those

10:44:26   20   third parties' actions in place.

21          So here, even if, you know, presuming that the FDA

22   cited statements influenced some third parties to take

23   adverse actions against the plaintiffs, you can't presume

24   redressability because there are these independent third

10:44:40   25   -- other organization statements, again, like the WHO and

Argument by Mr. Belfer

1    NIH and CDC, that are out there; and those statements are

2    still in place recommending against the use of COVID-19 --

3    against the use of ivermectin to treat COVID-19.

4         Additionally, you know, if the Court were to rule, for

10:44:55  5    instance, that the FDA does not have authority to make the

6    cited statements, that wouldn't affect the scientific --

7    the third-party's scientific understanding of the risks

8    and benefits of treating COVID-19.  It would be a legal

9    ruling on, essentially, procedural authority grounds.  It

10:45:09  10   wouldn't go to the scientific merits.  And so it wouldn't

11   give the third parties any reason to change their

12   understanding of whether you should use ivermectin to

13   treat COVID-19.

14        And so for all those reasons, even if the Court were

10:45:21  15   to order that the cited statements be taken down,

16   plaintiffs haven't shown that that would make any

17   difference because there are all these other statements

18   out there; and their requested relief itself wouldn't give

19   the third parties any reason to change their understanding

10:45:34  20   of the risks and benefits of taking ivermectin to treat

21   COVID-19.  So, you know, the plaintiffs have failed to

22   show redressability as well as traceability.

23        And, of course, that's only part of the jurisdictional

24   analysis.  There is also sovereign immunity.  And we think

10:45:48  25   that's actually an even clearer case why there is no

Argument by Mr. Belfer

1    jurisdiction here.

2          You know, again, these were -- these were tweets,

3    social media posts in conversational language.  They were

4    nonbinding recommendations.  They did not make -- they

10:46:02    5    were not binding on anyone.  They were not binding on

6    private parties or the FDA.  They did not set agency

7    policy.  They were simply nonbinding recommendations to

8    the public.  And so they were not agency action or final

9    agency action.

10:46:15    10          And as discussed in our briefs, an important

11    requirement for final agency action is that you need to

12    have a direct effect on the regulated party.  So, for

13    instance, in the *Franklin v. Massachusetts* case, the

14    Supreme Court held that the secretary of commerce's report

10:46:30    15    to the president was not final agency action because it

16    was simply a nonbinding recommendation.  The president's

17    report to Congress about congressional apportionment did

18    have a direct effect and was final; but the secretary of

19    commerce's report to the president was not final agency

10:46:46    20    action because it had, at most, an indirect effect on

21    apportionment.  It was simply a nonbinding recommendation

22    to the president.

23          And similarly, in the *Bennett v. Spear* case the

24    Supreme Court upheld this notion that you need a direct

10:46:58    25    effect to be final agency action.  And here, the

Argument by Mr. Belfer

1    plaintiffs have not shown any direct effect of any of the

2    cited statements on any other party.  At most, they show

3    an indirect theory of causation, whereby the cited

4    statements influenced third parties, who in turn allegedly

10:47:13    5    injured plaintiffs.  But that indirect line of causation

6    is not sufficient for final agency action.

7         THE COURT:  And on exhaustion, is a citizen

8    petition the only way that the plaintiffs could have

9    challenged the FDA's actions with the agency itself in

10:47:29    10   this case?  What else could they have done?

11        MR. BELFER:  So I am -- I think in this

12   particular case I'm not -- I'm not aware of another

13   mechanism that they could have used.

14        I think, generally, in terms of the issue of

10:47:41    15   exhaustion, there is not only one mechanism.  The focus is

16   not on which mechanism you use.  Instead, the focus is on

17   just raising your issues somehow to the agency.

18        So, for instance, if there were, like, a drug

19   approval, then you could raise the issue in the course of

10:47:54    20   the back and forth with FDA about the drug approval or you

21   could raise it, you know, as appropriate, as a citizen

22   petition.

23        Here, I think a citizen petition would have been

24   appropriate.  They could have filed a citizen petition

10:48:06    25   after FDA made its cited statements challenging those

Argument by Mr. Kelson

1  statements and they could have presented all of the issues

2  in their amended complaints to FDA in that citizen

3  petition and that would have been beneficial to the agency

4  by giving the FDA an opportunity to consider the issues,

10:48:19  5  in the first instance, to apply its expertise and

6  discretion, and it would have allowed the agency to

7  compile an administrative record that addressed their

8  issues.

9        And so, it would have benefited both the agency and

10:48:31  10  the Court; but they failed to do that.  The plaintiffs ran

11  straight to court without giving FDA an opportunity to

12  address their issues in the first instance.  And under

13  kind of core principles of administrative law, that's

14  unacceptable.

10:48:43  15        THE COURT:  Okay.  Let me hear from the

16  plaintiffs.  I may have some more questions for you once I

17  have heard from them.

18        MR. BELFER:  Thank you, Your Honor.

19        THE COURT:  Thank you.

10:48:51  20        MR. KELSON:  Good morning, Your Honor.

21        THE COURT:  Good morning.

22        MR. KELSON:  As a general matter, the FDA has no

23  authority to regulate the off-label use of drugs.  It

24  never has.  That dates back to the -- to when the FDCA was

10:49:08  25  first passed in 1938.  It's been a repeated consideration

Argument by Mr. Kelson

1  by Congress.  They have never given the FDA that

2  authority.  Going so far as to add a provision in

3  21 USC 396 to expressly prohibit interference, courts

4  across the entire country have repeatedly relied upon that

10:49:25  5  provision to show that -- to show that it applies to the

6  practice of medicine, including the prescription of drugs.

7      The government is trying to frame this case and its

8  actions and its response to reports about the use of

9  animal ivermectin.  That doesn't explain why they then

10:49:42  10  pivoted to talk about human-use ivermectin.  There is a

11  disconnect in what they are claiming the justification for

12  these actions were and what they actually did.

13      This is reaffirmed by the internal FDA documents that

14  talk about this new engagement strategy they had to

10:49:53  15  promote their recommendations to the public and the United

16  States.  And it belies the fact that what they were trying

17  to do was stop the use of ivermectin.  Their tweets are

18  explicit on that point.

19      So when the government says this was purely

10:50:05  20  informational, conversational, essentially a PR scheme or

21  a -- excuse me -- a PR endeavor, that doesn't explain

22  why -- that doesn't explain the language they actually

23  used, "Stop it.  Stop it with the ivermectin."

24      In the government's brief when it refers to a number

10:50:20  25  of these statements, including the statements why you

Argument by Mr. Kelson

1   should not use ivermectin to treat or prevent COVID-19,

2   the government has to qualify the statements in its own

3   brief and say "if a doctor prescribes you ivermectin for

4   the use of COVID-19."  The government's briefs, therefore,

10:50:34   5   implicitly recognize the title of that document; and the

6   FDA's other actions clearly convey that this is not an

7   acceptable way to treat these patients.  The only reason

8   the FDA would engage in these actions is because of their

9   predictable effect, the only explanation.

10:50:49   10       The Court is right to understand -- recognize that

11   this is a very much common-sense case.  The Supreme Court

12   recently, within the last year and a half, has made very,

13   very clear that courts are -- that courts and judges are

14   not required to exhibit a naivete from which ordinary

10:51:03   15   citizens are free.  That was -- you know, that was --

16   excuse me.  That was in 2019 in *Department of Commerce v.*

17   *New York.*  That was Chief Justice Roberts.  That applies

18   directly to this case.

19       To address some of -- to address upfront some of the

10:51:21   20   government's arguments and some of the government's

21   briefing, I want to be very clear to the Court that the

22   government did not move under 12(b)(6) to challenge any of

23   these claims on their merits.  The government is, thus,

24   conceding that the plaintiffs have alleged plausible

10:51:32   25   interference in their practice of medicine, that they have

Argument by Mr. Kelson

1  alleged plausible claims under the APA.  The government

2  has, instead, challenged them all on standing grounds or

3  challenged them on administrative exhaustion grounds or

4  sovereign immunity.

10:51:37  5      That should inform the Court's position and that

6  should also -- the Court should also take that into

7  consideration when the government tries to backdoor merits

8  considerations into other aspects of this case.

9      Second, in the government's reply brief the government

10:51:54 10  replies or the government cites *TransUnion* and says that

11  the plaintiffs are only alleging statutory violations.

12  That is incorrect.  We are alleging real harms to real

13  people that are reinforced by the statute that Congress

14  passed in 21, Section 396 and, to be honest, the entirety

10:52:10 15  of the FDCA, which does not give the FDA the authority

16  that it is trying to assume.

17      More importantly, if the Court would like to look at

18  -- if the Court would look at *TransUnion,* the government

19  omits the rest of the case, which weighs heavily in favor

10:52:22 20  of the plaintiffs here.  *TransUnion* is very clear that

21  there is an injury in fact when there is a harm that is

22  traditionally recognized as providing the basis for a

23  lawsuit in America or if there is some sort of common-law

24  analog.  The Court is also very clear that it doesn't have

10:52:35 25  to be an exact duplicate.  That Congress through statute

Argument by Mr. Kelson

1   or Congress through its own expressions can recognize

2   harms that might have been too trivial at common law but

3   were, nonetheless, harms.

4       In fact, in *TransUnion* the exact example that the

10:52:48   5   Court used is various intangible harms, including

6   reputational harm.  That is one of the -- that is one of

7   the allegations the plaintiffs have made here and, in

8   fact, provided evidence that they have been maligned on

9   line and that they constantly suffer reputational harm.

10:52:59   10      If the government is going to label ivermectin a horse

11  medicine or a horse dewormer and promulgate the idea that

12  it is only for animals, then the natural correlation is

13  that doctors who prescribe it are horse doctors or quack

14  doctors, which has been -- which has played out.  That is

10:53:12   15  enough of a harm to get into court.

16      In addition, *TransUnion* also emphasizes the due

17  respect that courts should pay to the decisions of

18  Congress; and Congress has been very clear that the FDA

19  should not interfere in the practice of medicine.  Now the

10:53:27   20  Court has -- while the Court has recognized that that

21  cannot completely -- that cannot completely remove the

22  necessity of showing injury, it should inform the Court's

23  decision that it is consistent with the Fifth Circuit's

24  decision that the plaintiffs need only show an

10:53:39   25  identifiable trifle of an injury.  The bar is low.  Any

Argument by Mr. Kelson

1   sort of injury will do, and the plaintiffs have alleged

2   many here.  That injury is sufficient, even if the harm is

3   difficult to prove or difficult to quantify.

4       Moving forward, the government places a lot of

10:53:56   5   emphasis on traceability.  The government's arguments in

6   this regard are flawed.

7       I'm sorry.  I have one more thought I just had about

8   the injury.  When the Court talked about injury in *Lujan*,

9   it discussed both a forward and a backward looking

10:54:16   10   analysis.  The exact language in *Lujan* allows plaintiffs

11   to present evidence of harms that have accrued.

12       So even if -- I guess this transitions into the --

13   sorry.  This transitions into traceability.  So even if

14   this wasn't predictable, which is a standard for

10:54:34   15   traceability, if in retrospect the plaintiffs can show how

16   these harms were determinative or were caused by the

17   plaintiffs, de facto causality, that is traceability.  The

18   plaintiffs are not cabined into the predictability test,

19   even though that is one way of establishing traceability

10:54:50   20   under the constitution, recognized by both the Fifth

21   Circuit and by the Supreme Court.

22       It's unclear what the -- what the government would

23   have thought their tweets were going to do if -- by saying

24   "stop it with the ivermectin" or "stop it" except to,

10:55:03   25   well, stop the use of ivermectin.  The government engaged

Argument by Mr. Kelson

1    in a singularly effective campaign here to malign a common

2    drug that has been used for a very long time and has been

3    dispensed in billions of doses.  It's one of the most

4    famously safe drugs in the history of human medicine.

10:55:18    5    And when people did exactly what the FDA said to "Stop

6    it.  Stop it with the ivermectin," I don't understand how

7    that would not be traceable back to the FDA.

8    So if it wasn't -- so it was predictable.  It also, in

9    retrospect, clearly points back to the FDA.  When everyone

10:55:36   10   points to the FDA, there is a pretty good chance that

11   that's where it is coming from.

12   The plaintiff -- or the government has repeatedly

13   stated that people have their own scientific intuitions

14   about the ivermectin.  That's not what is happening here.

10:55:47   15   People are pointing back and saying, "The FDA said no.

16   The FDA said no."

17   That is not a scientific analysis.  That is a

18   deference to the FDA, to an agency that the federal

19   government set up to be an authoritative voice on the use

10:55:59   20   of drugs but limited that authority not to practice

21   medicine and not to make recommendations about medicine.

22   So in that regard the FDA's actions cannot be excused

23   simply because they presume that everyone else has these

24   scientific understanding -- this scientific understanding.

10:56:14   25   That transitions into redressability.  Again, this

Argument by Mr. Kelson

1    is -- there is a common-sense intuition that when everyone

2    points to these FDA statements if a court were to come out

3    and say they were made without lawful authority and vacate

4    them that they would somehow retain their same equal

10:56:30    5    persuasive force.  That seems to brink reality, as well.

6         In addition, the government points to a number of

7    other entities that have taken positions on ivermectin.

8    Each of them are severely flawed.  I am not aware of the

9    FDA ever pointing to a pharmaceutical company and saying

10:56:44    10   that its statements have the same force and effect or are

11   of the same persuasive nature as the FDA.  That, to me, is

12   a strange argument I have never heard from the FDA before.

13        And I don't suspect the FDA plans on deferring to

14   pharmaceutical companies in the future.  In addition, the

10:57:00    15   FDA regularly disagrees with the World Health

16   Organization.  Remdesivir is a great example of that.  And

17   the FDA seems to think that its -- that its voice on these

18   drugs is more important than the World Health

19   Organization's.  That's enough to undermine reliance on

10:57:14    20   the World Health Organization, which also is not an

21   American body and doesn't have the same effect in the

22   United States.

23        The CDC regularly cites to the FDA, and the CDC does

24   not specialize in the use of drugs in America.  And the

10:57:23    25   NIH for a long period of time took no position on

Argument by Mr. Kelson

1    ivermectin, a long period of time during which harm was

2    caused to these plaintiffs.  So the FDA can't point to the

3    NIH and say that it has some sort of -- that it has the

4    same effect.

10:57:38  5    In addition, the Fifth Circuit has made very clear

6    with redressability, especially at this stage of

7    litigation, that plaintiffs have established their

8    standing if a favorable ruling could potentially lessen

9    the plaintiffs' injury.  It's a very low bar, and there is

10:57:54  10    absolutely a potential chance that the injury could be

11    lessened here.  That case is *Sanchez v. R.G.L.*  It's 761

12    F.3d 495.  I believe it's cited in our brief, as well.

13    But it seems very clear that when everyone is pointing

14    to the FDA that if this court were to vacate those FDA

10:58:12  15    statements that there is a potential chance or that it

16    could potentially lessen the injury that these doctors are

17    suffering.

18    In addition, in *McClure v. Ashcroft*, the Fifth Circuit

19    as well, says you only need to show an arguable chance

10:58:25  20    that a third party might consider changing its policy.

21    The government points out that Dr. Apter is subject to

22    current investigation or current proceedings against his

23    medical license.  That referral came from the Iowa State

24    Board of Medicine.  It came from another state board.

10:58:39  25    This was not some random person throwing a document into a

Argument by Mr. Kelson

1    referral and sending it to a state board.

2        The FDA's actions here, their statements, their

3    tweets, they are showing up in court filings.  They are

4    being relied upon by courts as the standard of care in

10:58:53   5    malpractice proceedings.  They are showing up in state

6    board proceedings, as we have shown here.  They are

7    showing up in public discourse as a way to malign and ruin

8    the reputations of doctors who have been working their

9    level best to fight a pandemic.

10:59:04  10        What the FDA has done is pervasive throughout the

11   entirety of healthcare and has caused significant injury

12   to these plaintiffs.  And for this court to declare them

13   unlawful and to vacate them and to enjoin the agency from

14   engaging in an unlawful practice of medicine in the

10:59:19  15   future, it undoubtedly would not only address those

16   injuries it would -- it would undoubtedly redress those

17   injuries.

18        More importantly, the practice of medicine is so well

19   established in this country in the use of off-label drugs.

10:59:32  20   Up to about 40 percent of off label -- of drugs are used

21   off label in critical care.  The presumption there should

22   be that if the FDA -- if that has changed somehow for

23   ivermectin and it started with the FDA, if that -- if that

24   action by the FDA is vacated that will -- that somehow

10:59:46  25   that normal will resurface.  It's been that way since the

Argument by Mr. Kelson

1    beginning of the practice of medicine in this country and

2    it's unclear why the FDA has decided in this particular

3    case to try and interfere with it but that's exactly

4    what's happened.

10:59:59    5    On the sovereign immunity points that the government

6    points out, I would like to respond in a few ways.  The

7    first is that this court should be careful to make sure

8    that -- to view the ultra vires claim and the APA claim

9    separately.  They are separate claims, and the standards

11:00:14    10    for them are separate.

11    First off, under *Larson* the Supreme Court has been

12    clear that when you are seeking injunctive relief against

13    federal officers for exceeding their authority that that's

14    not barred by sovereign immunity.  *Larson* resolves the

11:00:28    15    case for the ultra vires -- *Larson* resolves the sovereign

16    immunity issue for the ultra vires case.

17    THE COURT:  Wait.  Say -- say that again, please,

18    on *Larson*.

19    MR. KELSON:  *Larson* resolves the sovereign

11:00:41    20    immunity issue for the ultra vires claim.  The government

21    has exceeded its authority; and under *Larson*, sovereign

22    immunity does not bar -- sovereign immunity does not bar

23    injunctive relief against, quote, a federal officer that

24    acted in excess of his authority or under authority not

11:00:56    25    validly conferred.  That's *Larson* at 333 -- sorry -- 337

Argument by Mr. Kelson

1    in the U.S. Reports, Pages 690 to 691.  It's also cited in

2    our brief extensively.

3         In addition, the government decides -- the government

4    waited until the reply brief to challenge the plaintiffs'

11:01:13    5    interpretation of Section 396.  Not only have multiple

6    circuit courts applied that -- the plaintiffs'

7    interpretation of Section 396 about prohibiting the

8    interference of the practice of medicine, but this case is

9    not dependent upon that provision.

11:01:28    10    Whether or not Section 396 is in effect, the FDCA does

11    not give the FDA authority to do what it's doing here.

12    That provision is an emphasis that was added by Congress

13    to make sure the FDA did not overstep.  But if you go back

14    to the debates leading up to the 1938 Act and all through

11:01:44    15    the present, Congress has repeatedly expressed that the

16    FDCA does not have the authority to interfere with the

17    practice of medicine.  This is nothing new.

18         And so whether or not this court finds that

19    Section 396 applies here, it doesn't change the outcome of

11:01:56    20    this case.  Section 396 is merely an exclamation point

21    showing that Congress really did not want the agency doing

22    what it's doing now.

23         Moving on to the APA waiver of sovereign immunity, in

24    5 USC, Section 702, again, the difference between the

11:02:13    25    ultra vires and the APA claims is important.  The ultra

Argument by Mr. Kelson

1  vires claim does not require final agency action.  It only

2  requires agency action.  That is very, very clear from the

3  Fifth Circuit's precedent, for example, the

4  *Alabama-Coushatta* case.

11:02:27  5      The Fifth Circuit has also been clear that pretty much

6  everything an agency does qualifies as an agency action

7  under the -- under the APA.  There is Fifth Circuit

8  precedent that is directly on point.

9      I don't how to pronounce the case, *Avoyelles*

11:02:42  10  *Sportsmen's League*; but that one is very explicit that

11  anything the agency does is at least an agency action.

12  The question then becomes if it's final.

13      In addition, you have the *Data Processing* [sic] case,

14  which very clearly says for even informational statements

11:02:51  15  or agency action the debate will be over whether they are

16  final.

17      So to be very clear, as soon as the agency acted they

18  waived -- Section 702 waived sovereign immunity for an

19  ultra vires claim.  Finality is not a requirement.

11:03:03  20      For the other APA claims where finality would be a

21  requirement, it is also clear the agency has acted with

22  finality here.  The agency has maintained this position

23  for a year and a half.  While they say -- while the agency

24  has said that they might change their position based upon

11:03:17  25  further factual analysis, the Fifth Circuit expressly

Argument by Mr. Kelson

1   rejected that argument recently in the *Data Processing*

2   case -- or the *Data Marketing* case.  If you would like a

3   citation, that's 45 F.4th at 854.

4        The Fifth Circuit was very clear and actually

11:03:33   5   chastising the government that it recycles an argument the

6   Supreme Court has repeatedly rejected.  The action isn't

7   final because the agency can change its position after

8   more fact finding.  This argument is squarely foreclosed

9   by numerous Supreme Court decisions.

11:03:44   10       It would also mean that no agency action is ever final

11   because the agency can always change its mind after

12   further fact finding.

13       Looking at this case then, the agency has maintained

14   its position for a year and a half.  Their statements are

11:03:55   15   not qualified:  "Stop it" and "Stop it with the

16   ivermectin," "Should I take ivermectin to treat COVID-19"

17   or "Should I take ivermectin to treat or prevent COVID-19?

18   No."  Those are not qualified statements.

19       And the fact that they are followed up with "if my

11:04:08   20   doctor gives me ivermectin, take it exactly as prescribed"

21   -- whatever that language exactly is -- does not change

22   the fact that they have just stated unequivocally, "Should

23   I take ivermectin?  No."  Period.

24       And so even if -- in reading those statements

11:04:21   25   together, it's very clear that the government is either --

Argument by Mr. Kelson

 1  it's very clear that the best way to interpret that

 2  statement is that -- the best way to interpret that

 3  statement is that if my doctor prescribes me ivermectin

 4  for something else.

11:04:37  5      If the government was -- wanted to be clear that if

 6  the government -- that doctors could prescribe ivermectin

 7  for COVID-19 and then should be taken exactly as

 8  prescribed, it could have said that; but it chose not to,

 9  instead, putting all its emphasis and references to

11:04:50 10  COVID-19 to tell doctors and to tell patients they should

11  not -- to tell patients they should not take it and to

12  tell the public that they should not take it either.

13      I'm sure that this court is aware that doctors and

14  patients are part of the public and that patients are

11:05:01 15  consumers.  So saying that this document -- saying that

16  the government's main document why you should not take

17  ivermectin to treat or prevent COVID-19, by saying that

18  that was directed to consumers is not a fail proof -- is

19  not some sort of argument to get out of the real effect

11:05:17 20  that that document had or the fact that it is directly

21  talking to people that are in the doctor-patient

22  relationship.

23      In addition, on the finality point, the Fifth Circuit

24  and the Supreme Court have been very clear that finality

11:05:28 25  is flexible and pragmatic.  As part of that flexibility

Argument by Mr. Kelson

1   and that pragmatic consideration, this court should be

2   mindful of the fact that Congress in Section 396 said that

3   the FDA can't interfere in the practice of medicine.

4        It would be very passing strange if the agency could

11:05:44   5   do exactly what Congress told them not to and they could

6   turn around and say, "Our action wasn't final though.  So

7   it's okay."  Congress recognized that there was some sort

8   of real-world effect of the agency interfering in the

9   practice of medicine; and in so doing, that agency action

11:05:57  10   would have to -- would be final.

11        In addition, the Fifth Circuit has said it's a -- the

12   action only has to be binding as a practical matter, where

13   private parties might rely on it as the norm.  That's the

14   *Texas v. EEOC* case.  And it's very clear that it's become

11:06:13  15   a norm.  Courts are relying on it as the standard of care.

16        Like, directly under the Fifth Circuit's precedent in

17   *Texas v. EEOC* you would -- as a practical matter the FDA

18   statements have now become a norm in society.  They have

19   been the norm that is being relied upon by professional

11:06:28  20   bodies, by advisory bodies and by courts.

21        In that same case, the Fifth Circuit continued that

22   private party -- an agency action is final if private

23   parties are reasonably led to believe that failure to

24   conform will bring adverse consequences.  I think it's

11:06:42  25   safe to say that failure to conform with the FDA's

Argument by Mr. Kelson                                                    32

           1    position here has brought adverse consequences to these

           2    doctors both reputationally, the fact that Dr. Apter is

           3    now facing board charges.

           4         So viewed in that flexible and pragmatic sense, there

11:06:52   5    are numerous factors which weigh in favor of finality

           6    here, not to mention the common sense -- not to mention

           7    the common sense view of what the agency has done in

           8    reading its own language.

           9         As an additional point, just in response to the

11:07:07  10    government, in *Bennett* the government was acting on a

          11    third party.  So there is -- there is some -- there is

          12    other cases where the fact -- the fact of the matter is

          13    there are legal consequences.  The government can't

          14    launder its actions by making -- setting up some sort of

11:07:22  15    standard that can then be relied upon as a third party to

          16    impose those -- by a third party to impose those

          17    consequences.

          18         In addition or finally, in response to the

          19    government's reply brief, I would like to point out to the

11:07:33  20    Court specifically that on page, I believe it was, 21 the

          21    government makes very clear in its reply brief that it is

          22    not arguing a citizen petition is required.  That

          23    concession is incredibly important because the Fifth

          24    Circuit has been very, very clear that unless exhaustion

11:07:51  25    is required by statute or by regulation, the only time

Argument by Mr. Kelson

1  administrative exhaustion is necessary is when there is

2  some sort of adversarial proceeding below.

3      In fact, the government cites repeatedly *Palm Valley.*

4  In Footnote 6 of that opinion Judge Costa is explicit that

5  the administrative exhaustion requirements only apply in

6  that case because there is a regulation that requires it.

7      If there is no regulation, you have to have

8  adversarial proceedings below.  You have to have something

9  tantamount to a judicial proceeding.  That is not present

10  here.  That is not in any way present here because the

11  government gave no process.  Instead, it acted

12  unilaterally to push its -- to push its public campaign.

13      In fact, the examples that the government gives talk

14  about when there is, for example, some sort of agency

15  proceeding over a drug approval, when there is some sort

16  of existing agency proceeding.  There was none here.  And

17  if a citizen petition is not required, which we contend it

18  is not, based upon the plain language but also based upon

19  the government's own admission that a citizen petition is

20  not required, then we are in a separate world of

21  administrative exhaustion.

22      And what the government would purport to this court

23  would be a fundamental change in how administrative

24  exhaustion has been run in this country and they would

25  impose a brand new requirement that has never been

*Laura Wells, RPR, RMR, CRR, RDR*

Argument by Mr. Kelson                                    34

1    recognized that a party must go to an agency and litigate

2    its case with an agency before it goes to the government

3    when the agency gave no process ahead of time.

4         The whole purpose of administrative exhaustion is to

11:09:09    5    avoid parties sandbagging an agency and waiting until

6    court to raise their claims or to give the agency the

7    opportunity to engage -- to apply its expertise during its

8    proceedings.

9         None of that applies here.  None of these

11:09:20   10    considerations are relevant.  There were no proceedings.

11    The government has acted.  It's been final.  In addition,

12    this is a legal question.  This is not some sort of

13    factual dispute for the agency.  And so the fact that

14    there is no agency expertise here that the Court would

11:09:36   15    need to defer to, none of the factors that weigh in favor

16    of agency exhaustion would otherwise apply.

17         So agency -- by the government's own admission, agency

18    exhaustion is not required by the law.  It is not required

19    by a statute.  By very clear Fifth Circuit case law and by

11:09:51   20    -- it is not required as a prudential matter; and even if

21    it were required as a prudential matter, there are ample

22    reasons for this court to weigh that exhaustion

23    requirement because none of the factors that weigh in

24    favor of exhaustion are present here.

11:10:06   25         I think that that is -- those are my main responses to

Argument by Mr. Kelson

1    what the government has said.  If you have -- you know, if

2    the Court has any questions, I would happy to answer them.

3            THE COURT:  Sure.  No.  I appreciate that.  Are

4    you aware of any cases anywhere else where patients are

11:10:21  5    the plaintiffs suing over the FDA's comments on

6    ivermectin?

7            MR. KELSON:  I don't know of any -- I am not

8    aware of any cases where patients are suing the FDA.

9            THE COURT:  All right.  Any idea why there aren't

11:10:35  10    any -- I guess this is a doctors' case, not a patients'

11    case is why there aren't any --

12            MR. KELSON:  It's a doctors' case.

13            THE COURT:  -- patients among the plaintiffs in

14    this case here today.

11:10:44  15        And another kind of general question.

16            MR. KELSON:  Just as one consideration for the

17    Court, when it comes to the need for ivermectin, the

18    plaintiffs see these things every day.  They are well

19    immersed in the science; and they are well immersed,

11:11:03  20    actually, in the practice of medicine prescribing

21    ivermectin or trying to prescribe ivermectin and dealing

22    with the public backlash they get for doing so.

23        With patients, most patients are only seeking

24    treatment for COVID; and then once it's over, it's done.

11:11:14  25    But the benefits of a lawsuit and the motivation for a

1  lawsuit are significantly diminished in that regard.

2      Whereas with these doctors, they have been living in

3  this world for a year or a year and a half now and they

4  have suffered significant reputational harm as a result of

11:11:26  5  it.  They see this interference with their practice of

6  medicine every year -- every day.  It takes an extreme

7  toll on them but also then makes it difficult when they

8  are constantly battling trying to write prescriptions and

9  get prescriptions for their patients and then they are

11:11:39  10  fighting with pharmacists who are saying, "Well, the FDA

11  says no."

12      And so, just as a practical matter in that regard, the

13  explicit answer or the exact answer to your question is I

14  am not aware of any plaintiffs that are suing the FDA.  I

11:11:51  15  do know some plaintiffs -- I do know of some plaintiffs

16  who have sued hospitals to try and get ivermectin in the

17  past.  There were a few of them in the news.

18      But it also is very easy for the Court to see why this

19  is a particularly problematic issue for doctors, and that

11:12:05  20  is why the three plaintiffs in this case that I represent

21  have been willing to undertake the expensive burden of

22  litigation to try and rectify the injuries that they have

23  suffered.

24          THE COURT:  I believe the government noted that

11:12:18  25  it was, like, 26 months or something from the time the FDA

Argument by Mr. Kelson

1    first started making these statements that the lawsuit was

2    filed.  Is there a reason for that delay?

3              MR. KELSON:  So I think there are -- there are a

4    number of reasons that could be relevant.  I'm not sure

11:12:33  5    that they are in any way required to bring a lawsuit

6    within a certain -- they have a four-year statute of

7    limitations under the APA or six-year statute of

8    limitations.

9              When the government first started in 2020 or early

11:12:44  10   2021, the statements were significantly more benign.  They

11   were problematic, but they were more benign.  It really

12   took off in August when they started with the "You are not

13   a horse.  You are not a cow" campaign and when they

14   started labeling doctors as essentially horse doctors or

11:12:59  15   quack doctors.  And so that -- that exacerbated the

16   injury.  The government then doubled down recently, I

17   believe it was in April, with another tweet.

18             So to say this is anything about animal ivermectin is

19   even more problematic under the light of the fact that

11:13:14  20   they are continuing the horse trope many, many months

21   afterwards.

22             As a result, because the government has maintained

23   these documents and has been doubling down on them, like,

24   the injury has been increasingly severe.  And, quite

11:13:26  25   frankly, sometimes it takes a while to find a lawyer who

Argument by Mr. Kelson

1   will take your case.

2        There are a number of considerations and then, you

3   know, we put an extensive amount of work into trying to

4   find all the publicly-available examples we could have to

11:13:39  5   track down what was going on and to make sure that we

6   could substantiate the plaintiffs' claims.

7        So for those reasons and the fact that the plaintiffs

8   have a significantly long runway, six years to bring APA

9   claims, 26 months isn't actually unreasonable at all.

11:13:56  10       THE COURT:  You argue for a very broad

11  interpretation of agency -- of what constitutes agency

12  action.  If everything an agency does is agency action

13  under the APA, then does that mean the APA is kind of a

14  general waiver of sovereign immunity?  That's kind of what

11:14:15  15  it sounds like.

16       MR. KELSON:  No.  No.  Because, yes, everything

17  -- the Fifth Circuit has been explicit that everything an

18  agency does is going to fall under the definition of

19  agency action; but to bring a claim under the APA, for

11:14:27  20  example, and to claim a waiver of sovereign immunity under

21  the APA, you have to show final agency action.  So that is

22  one distinction.

23       The ultra vires claim, which is not -- which does not

24  have a finality requirement to it under the Fifth

11:14:38  25  Circuit's precedent, yes, if an agency acts then there is

Argument by Mr. Kelson

1   a waiver of sovereign immunity but it's very limited and

2   it only applies to injunctive relief, not damages.  That

3   also should not concern the Court because it only becomes

4   relevant when the agency has acted unlawfully.

11:14:51   5   All the government's arguments here have nothing to do

6   about whether or not their actions were lawful.  They have

7   everything to do about setting up barriers for the

8   plaintiffs to begin a course to seek remedy.

9   And so to the extent that the agencies act unlawfully,

11:15:01  10   then, yes, they would be subject to suit.  If the agencies

11   haven't acted unlawfully, it actually becomes immaterial

12   whether or not agency action is brought because any agency

13   action that would be -- any challenge to any agency action

14   -- I'm sorry.  I might have been speaking to quickly.

11:15:15  15   Any challenge to any agency action that is lawful will

16   be promptly dismissed, and so it's not going to be a

17   burden on the agency either.

18           THE COURT:  Is any informational statement that

19   the FDA makes an ultra vires act by the agency?

11:15:31  20           MR. KELSON:  That would be an agency specific

21   inquiry, Your Honor.  The FDA in this particular case

22   is -- the FDA sits in a very unique spot in the United

23   States because of the authority that the government has

24   given it to regulate the approval of drugs to let the

11:15:49  25   drugs enter into the market and withholding the ability to

Argument by Mr. Kelson

1   interfere with the practice of medicine.

2       Most informational statements are not going to be

3   problematic.  The FDA talks about how, well, we've issued

4   warning letters in the past.  That's not -- that might be

5   an agency action, but it's not unlawful for them to issue

6   a warning letter to a doctor or to someone who has -- to

7   someone who is marketing a drug -- who is marketing a drug

8   contrary to the FDCA.

9       The statements here go far beyond purely

10  informational.  These are not informational statements.

11  These are directives to the public.  These are directives

12  to patients or these are strong medical -- these are

13  medical recommendations.  That is the heart of the

14  practice of medicine.

15      And so this case needs to be viewed in the

16  context-specific capacity of the fact that we are dealing

17  with the FDA which has significant authority in this area,

18  which has outsized -- which throws around outsized weight

19  in this area and the fact that Congress has explicitly

20  recognized the problems that the FDA could cause if it

21  started meddling in the practice of medicine.  It's

22  relevant throughout the debates.  It's relevant in

23  Section 396 of Title 21.

24      And so in this particular case we are not talking

25  about informational statements only.  We are talking about

Argument by Mr. Kelson

1    statements that are making recommendations about medicine.

2    We're talking about statements that are directing the

3    public to "stop it" or to "stop it with the ivermectin."

4         So in that regard, this case is not about whether or

11:17:15  5    not informational statements are illegal.  It's about the

6    statements here that the FDA has made.

7         Also, if the government -- the government has

8    mentioned or has tried to make the argument that it's just

9    -- that it can speak freely.  That's a merits argument,

11:17:25  10    and that should not be resolved at the motion to dismiss

11    stage because the government has not raised a 12(b)(6)

12    motion challenging the merits of the claims.

13         THE COURT:  You mentioned warning letters.

14    Warning letters seem like they are more than

11:17:39  15    informational.  They can approach being a directive, too,

16    can't they?

17         MR. KELSON:  The FDCA has the authority to police

18    how drugs are marketed.  That's like -- that is within

19    their express statutory authority.  So it's -- it's

11:17:50  20    somewhat of a red herring or a straw man where the

21    government says, "Look, we send out these warning letters

22    telling a pharmacist we heard that you are promoting this

23    drug and saying that it is -- it should be used for these

24    purposes."

11:17:59  25         That is separate from what is going on here because we

1  are not talking about advertising drugs for this -- for

2  sale and distribution.  We're talking about how doctors

3  deal with their patients and what drugs should be used for

4  particular treatments off label.

11:18:11  5       The FDA has authority over what -- over when drugs can

6  be admitted to the market, what labeling they can use, and

7  how they can be marketed.  If they issue a warning label

8  on those conditions that is within their authority, then

9  they are within their authority; but that's not what they

11:18:25  10  are doing here.  They are telling people to stop -- they

11  are telling consumers, not distributors.  They are telling

12  consumers to stop it.  They are telling doctors, the

13  public, to stop it.  That is a totally different thing

14  that is outside of their authority.

11:18:38  15       THE COURT:  I know that courts have held that

16  warnings letters are not final agency action.  If warning

17  letters aren't, then how can the statements in this case

18  be?

19       MR. KELSON:  So, in the first instance, a warning

11:18:56  20  letter is more tentative than a statement like "Stop it"

21  or "Stop it with the ivermectin."  So there is a

22  difference in the tone of the letter -- of the statements.

23       In addition, Section 396 should inform this court's

24  flexible and pragmatic approach to finality.

11:19:13  25       In addition, the warning letters -- the warning

Argument by Mr. Belfer

1   letters are explicitly, by their terms, in preparation for

2   a potential enforcement action.  And so they are very

3   clearly non-final by their nature.  They are issuing a

4   warning that in the future they may choose to take action;

11:19:30   5   whereas, these statements about ivermectin have no such

6   future action attached.  They are not -- they are not in

7   anticipation of something else.  They are not a warning.

8   They are not an initial volley in an ongoing conversation

9   with a regulated party.  These are direct and final

11:19:45   10  statements to the public, to doctors, to consumers, to

11  patients.  And so, in that regard, they are different.

12       And in the event the Court feels otherwise, none of

13  that affects the ultra vires claim which, in any event,

14  should proceed.

11:19:57   15       THE COURT:  Okay.  Well, thank you.  I'm going to

16  see if the government has anything else, but I appreciate

17  it.

18       Counsel, you are welcome to -- go ahead.  You are

19  welcome to cover whatever you would like in response to

11:20:14   20  the plaintiffs' arguments; but I would like you to

21  specifically address, for one thing, the allegation that

22  the statements the FDA made that the plaintiffs are

23  complaining about in this case were not merely

24  informational but were more like directives.

11:20:33   25       MR. BELFER:  Yes, Your Honor.  The cited

Argument by Mr. Belfer

1    statements were not directives.  They were not mandatory.

2    They were recommendations.  They said what parties should

3    do.  They said, for example, why you should not take

4    ivermectin to treat COVID-19.  They did not say you may

11:20:50   5    not do it, you must not do it.  They did not say it's

6    prohibited or it's unlawful.  They also did not say that

7    doctors may not prescribe ivermectin.

8        THE COURT:  Well, they very flippantly say "stop

9    it" in the tweet.

11:21:04   10        MR. BELFER:  Yeah.  They use informal language,

11    that is true; but they did not -- they did not say you may

12    not do this or it is unlawful.  If you look at the

13    language they used, it is -- yes, it's informal.  It's

14    conversational, but it's not mandatory.  It never said

11:21:17   15    this is unlawful, it's prohibited.  And so that contrasts

16    with, you know, other things that FDA might say where it

17    is more -- more mandatory.

18        And if you look at the kind of statements at issue

19    here, we are not talking about a publication of the CFR or

11:21:31   20    an official memorandum.  We're talking about tweets and

21    Instagram posts and website posts.  These are much more

22    informal fora.

23        And so if you look at the informal fora, the fact that

24    this is informal conversational language, plaintiffs

11:21:45   25    cannot show that it was predictable that anyone would look

Argument by Mr. Belfer                                    45

1   at these statements and think that they were prohibited

2   from taking ivermectin to treat COVID-19, especially given

3   that, you know, the tweets both linked to the article and

4   the article said that doctors have discretion and that if

11:21:56  5   your doctor prescribes ivermectin, take it exactly as

6   prescribed.

7        So a few general points before we get into the

8   specific issues that plaintiffs raised.  So plaintiffs

9   argue that -- they tried to frame this case as about the

11:22:15  10   off-label use of drugs, off-label prescription; but this

11   is not a case about off-label prescription.  This is a

12   case in particular about the use of ivermectin to treat

13   COVID-19.

14        No one is questioning that doctors generally have

11:22:26  15   authority to prescribe off-label in appropriate

16   circumstances.  Instead, what FDA is saying here is it's

17   warning consumers about the risks of using ivermectin to

18   treat COVID-19.

19        And the fact that FDA generally does not prohibit

11:22:40  20   doctors from prescribing off-label has never been taken to

21   be a limitation of FDA's authority to communicate

22   publicly.  FDA communicates publicly about the risks of

23   drugs all the time.  And, in fact, in the amended

24   complaint the plaintiffs concede that FDA generally has

11:22:53  25   authority to communicate to the public about the risks of

Argument by Mr. Beffer                                    46

1    drugs.  So there is no dispute that FDA generally has

2    authority to communicate with the public about the risk of

3    drugs.

4         Plaintiffs argue that Section 396 is a limitation on

11:23:05  5    that authority.  But tellingly, in their argument, the

6    plaintiffs don't really defend 396 and for good reason.

7    Section 396 is directed to medical devices, not drugs.

8    And even beyond that, 396 is -- does not establish any

9    general interest in -- against interference with the

11:23:22  10   practice of medicine, let alone any interest to get into

11   FDA communications.  It's not about that.

12        Instead, 396 is very specific.  It's about doctors'

13   authority to prescribe or administer medical devices; and

14   even if you could strike out the word "devices" and

11:23:38  15   replace it with "drugs," it would still only be about

16   doctors' authority to prescribe or administer drugs.  And

17   here there is no allegation that doctors' authority to

18   prescribe or administer drugs was ever impaired.

19        The plaintiffs, by their own admission, have continued

11:23:51  20   to prescribe ivermectin.  So they always had the

21   authority.  It may be that patients were not able to fill

22   prescriptions, but the doctors themselves always had the

23   authority.  So Section 396 is not applicable, and there is

24   -- there is really no general interest against

11:24:05  25   interference with the practice of medicine at issue here.

Argument by Mr. Beiler

11:24:23

1    So I would like to respond in particular to a few of

2    the arguments that have been made on the various issues in

3    this case.  Starting with sovereign immunity, plaintiffs

4    argue that their ultra vires claim is essentially an

5    exception to sovereign immunity.

6        But in the *Danos* case from the Fifth Circuit, the

7    court said that it's not enough simply to allege that an

8    agency action is unlawful or unauthorized.  You have to do

9    more.  You have to show that the agency had no colorable

11:24:38
10   basis for its exercise of authority; and plaintiffs have

11   not done that here because, again, they concede that FDA

12   generally has authority to communicate with the public

13   about the risk of drugs.  They argue that 396 is a

14   limitation on that authority; but as we discussed, 396 is

11:24:51
15   inapposite here.

16       And so plaintiffs have not met the standard under

17   *Danos* of showing the FDA had no colorable basis for the

18   exercise of its authority.  Right.

19       And so with regard to agency action, plaintiffs take

11:25:06
20   the position that essentially any -- any statements by the

21   agency is agency action.  And they say that the Fifth

22   Circuit has held that essentially everything an agency

23   does is agency action, but that's simply not true.

24       If you look at cases like *Alabama-Coushatta* or

11:25:22
25   *Walmart,* both Fifth Circuit cases, those make clear that

Argument by Mr. Belfer

1  not everything is agency action.  In their briefing,

2  plaintiffs rely specifically on their contention that the

3  agency -- the cited statements are a rule.  That is their

4  basis for saying there is agency action.

11:25:37  5      So let's look at the definition of a rule.  The

6  definition of a rule -- I can pull it up right here.  So,

7  essentially, to be a rule you need to be binding on either

8  the agency or a private party or you need to interpret a

9  substantive rule or you need to set agency policy.  Those

11:25:53  10  are all the rules.  But here the cited statements are none

11  of those things.  They are not binding on anyone.  They

12  don't interpret any rule, and they do not -- they don't

13  set agency policy.

14      And so you need to meet -- plaintiffs rely on a rule,

11:26:09  15  but here the cited statements simply don't meet the

16  statutory definition of a rule.

17      And then, with regard to final agency action, I guess

18  starting with consummation of the agency decision-making

19  process, we do not argue that the consummation prong is

11:26:25  20  met simply because the cited statements might be revised

21  in the future.

22      Sure.  An agency can always take future action, but

23  that's not what we're arguing.  Instead, our argument is

24  that if you look at the face of the cited statements

11:26:38  25  themselves, they are expressly tentative.  They state that

Argument by Mr. Belfer

 1  they are based on currently available data, that more data

 2  is needed, and that clinical trials are ongoing.

 3      So if you just look at the face of the statements,

 4  they are expressly tentative and based on currently

11:26:50  5  available data.  They do not state FDA's final definitive

 6  position on the use of ivermectin to treat COVID-19.

 7      You know, plaintiffs say that these statements --

 8  going to the legal consequence prong, plaintiffs say that

 9  these statements are unequivocal.  They are not

11:27:06  10  unequivocal.  They generally recommend against using

 11  ivermectin but they also say if your doctor prescribes it,

 12  take it exactly as prescribed.  And there is no allegation

 13  that anyone read part of the statement but not the entire

 14  statement.  And so plaintiffs have not shown that

11:27:18  15  plaintiffs would not read the entire statement and see

 16  that nuance in the statements.

 17      Plaintiffs cite *Texas v. EEOC* regarding this notion

 18  that if the agency establishes a norm that that's final

 19  agency action; but the *Texas v. EEOC* case is plainly

11:27:33  20  inapposite.  In that case, the agency established a norm;

 21  and if private parties did not comply with the norm, they

 22  were subject to legal liability.  They could be sued for

 23  failing to comply with the norm.  That's a direct effect

 24  on those third parties by changing their legal liability.

11:27:47  25      Here, there is no effect.  The cited statements have

Argument by Mr. Belfer

1   no effect on anyone's legal liability.  There is no direct

2   legal consequence on anyone.

3       And, similarly, the plaintiffs cite the *Bennett* case

4   but *Bennett* -- and that's *Bennett v. Spear* with the

11:28:00  5   Supreme Court -- is, again, different.  In *Bennett* the

6   Fish and Wildlife Service issued a biological opinion; and

7   if other agencies did not comply with that biological

8   opinion, they could be subject to criminal and civil

9   liability.  So in *Bennett* there was a direct legal effect

11:28:15  10  on other agencies.  If they did not comply with the Fish

11  and Wildlife Services statement, they could be subject to

12  criminal or civil liability.

13      Again, here there is no similar direct effect.  No one

14  would be subject to criminal or civil liability if they

11:28:28  15  prescribed ivermectin to treat COVID-19.  Instead, the

16  statement expressly acknowledged that doctors can

17  prescribe ivermectin for that purpose.

18      So I would like to say a few words about standing.  So

19  the plaintiffs argue that FDA is trying to stop the use of

11:28:48  20  ivermectin and that its purpose -- its purpose was to stop

21  the use of ivermectin; but again, if you look at the

22  language of the statements, FDA never said that doctors

23  cannot prescribe ivermectin to treat COVID-19.  They said

24  doctor -- if your doctor writes you a prescription, fill

11:29:03  25  it and take it exactly as prescribed.  So the FDA

Argument by Mr. Belfer

1    expressly acknowledged that you can use ivermectin for

2    this purpose if your doctor prescribes it.

3         And, you know, looking at FDA's intent, FDA was really

4    focused on consumers.  It was advising consumers who could

11:29:20    5    buy this product over the counter that they shouldn't take

6    it.  They did not say that if your doctor prescribes it,

7    don't take it.  They said follow your doctor's advice.  If

8    your doctor prescribes it, take it exactly as prescribed.

9         You -- right.  So regarding the *TransUnion* case, you

11:29:35    10    know, plaintiffs say that essentially that there is injury

11    in fact here, and they cite that case.  So what the

12    Supreme Court held is that you cannot presume an injury in

13    fact just because there is an alleged statutory violation.

14    You still need to look under Article III at whether

11:29:55    15    plaintiffs have met the requirement for standing.

16         So, as we discussed, there is no violation of 396.

17    FDA did not exceed its authority.  But even if plaintiffs

18    had shown a violation of Section 396, that is not itself

19    alone -- that itself is not alone -- that alone is not

11:30:10    20    sufficient to show standing.  You would still need to show

21    an injury in fact under Article III.

22         And because the alleged violation, interference with

23    the practice of medicine, is a vague conclusory allegation

24    and plaintiffs were always able to prescribe ivermectin,

11:30:26    25    they have not shown any injury in fact under Article III.

Argument by Mr. Belfer

```
           1      Regarding traceability, you know, plaintiffs try to

           2   minimize their burden to show traceability; but

           3   importantly, the standard is that -- or, sorry.  Under the

           4   Daves case from the Fifth Circuit the Court held that it's

11:30:44   5   substantially more difficult to show traceability when the

           6   causal chain relies on independent third-party conduct.

           7   And so to meet that much higher burden when, as here,

           8   plaintiffs rely on this indirect causal chain, you need to

           9   show that the third-party conduct would be a predictable

11:31:02  10   response to the cited statements.

          11      And because FDA statements were directed at consumers,

          12   they were, you know, informal, conversational, and because

          13   they expressly acknowledged doctors' discretion to

          14   prescribe ivermectin, it would not be predictable that,

11:31:14  15   for example, a hospital would punish a doctor for

          16   prescribing ivermectin when the statements themselves

          17   acknowledged that doctors could prescribe ivermectin to

          18   treat COVID-19.

          19      You know, plaintiffs state that everyone is pointing

11:31:27  20   to FDA.  So, surely, FDA must have caused the third-party

          21   conduct.  But if you look at what is alleged in the

          22   complaints in the exhibits, it's clear that third parties

          23   are not just relying on FDA.

          24      For example, Exhibit 12, which is the statement of

11:31:42  25   Sentara, which is a former employer of Dr. Marik, they did
```

*Laura Wells, RPR, RMR, CRR, RDR*

Argument by Mr. Belfer

1  not simply rely on FDA.  Instead, they cited statements

2  from many organizations -- FDA, CDC and several other

3  organizations -- and they provided independent medical

4  analysis.  They said there is no randomized control trial

11:31:59  5  that supports use of ivermectin to treat COVID-19.

6      So, you know, plaintiffs' employers, pharmacies,

7  insurance companies, these are sophisticated entities that

8  make independent -- that exercise independent professional

9  judgment as shown by Exhibit 12.  They did not simply take

11:32:13  10  what FDA said and accept it at face value.  They looked at

11  FDA statements in combination with the statements made by

12  many other organizations.  They also performed independent

13  scientific analysis.  They looked at the data.  And based

14  on all of that, they concluded that they would not

11:32:27  15  recommend prescribing ivermectin.

16      And so, you know, that undermines redressability

17  because it shows that even if you took away FDA cited

18  statements, just those statements, you would still have

19  all those other third-party statements that Sentara and

11:32:42  20  other organizations relied on.

21      And I would just give you a few more citations.

22  Exhibit 25, which is the joint statement by the American

23  Medical Association and other organizations, also.  So

24  it's not just FDA but many other -- many other statements.

11:32:55  25      And the *DeMarco* case the plaintiffs cite, that cites

Argument by Mr. Kelson

1    not just FDA but many other organizations.

2        And so simply taking away these particular FDA

3    statements, plaintiffs have not shown that that would

4    likely cause third parties to reverse their past conduct;

11:33:07  5    and again, that's the standard.  You have to show -- you

6    have to -- you have to have allegations that plausibly

7    allege that it would be likely that third parties would

8    reverse their past conduct and redress plaintiffs'

9    injuries, and plaintiffs have not shown that it would be

11:33:21  10   likely.  Right.

11       So I think, for all those reasons, plaintiffs have not

12   shown that there is any waiver of sovereign immunity

13   because they have not shown agency action or final agency

14   action.  And they also have not shown that they have

11:33:38  15   standing because they have not shown injury in fact for

16   many of their injuries, and none of their injuries

17   satisfied the traceability or addressability prongs.

18       So unless Your Honor has any further questions.

19       THE COURT:  No.  I don't think I do right now.  I

11:33:53  20   appreciate it.  I'm going to give the plaintiffs the last

21   word.  Thank you, Counsel.  Appreciate it.

22       MR. BELFER:  Thank you, Your Honor.

23       MR. KELSON:  I believe the government began by

24   saying that these were only informal tweets, these were

11:34:16  25   only informal Instagram posts or LinkedIn posts.

*Laura Wells, RPR, RMR, CRR, RDR*

Argument by Mr. Kelson

1      The government can't launder unlawful action as a good

2   PR scheme or as a good PR endeavor.  The agency acted.

3   Whether it acted through an informal way with definitive

4   language or whether it went through the Federal Register

11:34:33   5   doesn't change the fact that the agency acted here.

6      The government is trying to -- tries to downplay

7   *TransUnion;* but *TransUnion* explicitly recognizes that

8   while you can't merely allege statutory harm, other

9   injuries can be drawn from past precedent, from common-law

11:34:52   10   analogs.  It specifically points out reputational harm,

11   which we have alleged here.

12      There is a common-law analog to tortious interference

13   with a doctor-patient relationship that's recognized in

14   Texas.  If you -- you know, if you want a case for that,

11:35:02   15   you can look at the *Garcia* case from the Northern District

16   of Texas.  It's 1999 -- it's an unpublished case; but it

17   cites a number of other Texas cases -- 1999 Westlaw

18   362787.

19      So *TransUnion* squarely supports the plaintiffs here.

11:35:19   20   It shows that their injuries are real, that while there is

21   a statutory violation, which should inform the Court's

22   interpretation of the injury, and since they only need an

23   identifiable trifle, there is also plenty of common-law

24   analogs to show exactly what it is the doctors have

11:35:35   25   alleged here.

*Laura Wells, RPR, RMR, CRR, RDR*

Argument by Mr. Kelson

1      One of the amicus briefs, the American Association of

2  Physicians and Surgeons also points out the *Tozzi* case

3  where an agency labeling something as dioxin was enough to

4  cause harm.  It was enough to establish standing.

11:35:43   5      The FDA has labeled this a horse drug.  The FDA has

6  maligned the use of ivermectin and that the agency has

7  told people to stop it.  If there was standing in the

8  *Tozzi* case from the DC Circuit, then there is definitely

9  standing here.

11:35:59  10      I am not in any way backing away from the plaintiffs'

11  interpretation of Section 396.  That statute has been

12  repeatedly interpreted by circuits across the entire

13  United States as applying to the practice of medicine,

14  including the prescription of drugs.

11:36:12  15      The government in its briefing says that by using a

16  "see" statement, a "see" signal to introduce the citation

17  that the government is -- that the Fifth Circuit was

18  saying that it was an unrelated -- it was a related but

19  not directly on point case.  That is not what a "see"

11:36:26  20  signal means.  A "see" signal means that the cited -- or

21  the citation directly supports the proposition stated in

22  the preceding sentence.  That is Bluebook Rule 1.2.

23      As a result, all these courts have recognized that it

24  applies.  If you look at the -- to the extent there is a

11:36:41  25  scriveners error in that provision, so be it; but that

Argument by Mr. Kelson

1    provision was clearly intended to stop the FDA.  And even

2    if it wasn't, the FDA doesn't have this authority.  That

3    has been very clear for 100 years.

4         I don't -- I don't -- unless the Court would prefer

11:37:00    5    otherwise, I don't need to walk through all the -- I don't

6    need to re-walk through all the arguments that we have

7    already made in response to the government, except I would

8    -- the only additions I would make is to point the Court

9    to *Avoyelles Sportsmen's League* where the Fifth Circuit

11:37:15   10    was explicit that the APA defines the term "rule" broadly

11    enough to include virtually every statement an agency may

12    make.  That's a direct quote from a Fifth Circuit case.

13         In addition, the definition of "rule" in the rule --

14    in the APA is not exhaustive.  It is prefaced by the word

11:37:29   15    "includes."  That means that there -- it is giving

16    examples of a fall within a rule; and as the Fifth Circuit

17    has recognized, that includes every statement an agency

18    may make.

19         And if the Fifth Circuit's precedent isn't sufficient

11:37:43   20    to satisfy this case, which we believe it is, there is

21    also a DC Circuit case on the finality issue called

22    *Ciba-Geigy Corp.*  It's cited in our briefs.  But it talks

23    about how a hyper-technical approach is not appropriate

24    and that a series of pronouncements may constitute final

11:37:59   25    agency action if their cumulative effect causes injury.

Argument by Mr. Kelson

1    That case is directly on point.

2         So to the extent this court wants to look outside the

3    Fifth Circuit, the DC Circuit has a case that is directly

4    on point with both *Tozzi* and *Ciba-Geigy*, both of which are

11:38:13   5    cited either in our brief or in the amicus brief.

6         In sum, the doctors here have been suffering -- have

7    suffered injuries at the hands of the FDA's public

8    pressure campaign for a long time now, well over a year.

9    And this court has the power to stop that or to give them

11:38:39   10   the possibility of seeking relief.  The redressability

11   standard is low.  They just have to show the potential for

12   some sort of relief.

13        Especially at this stage of the proceedings, the

14   standard is plausibility; and the plaintiffs have

11:38:51   15   unquestionably made plausible arguments, cited numerous --

16   numerous public statements, numerous public actions by the

17   agency that establish more than a plausible injury, more

18   than a plausible traceability back to the FDA, and more

19   than plausible redressability.  That's all that is

11:39:10   20   required at this stage in the proceeding.

21        And that just -- that is only the publicly-available

22   information that we have been able -- that we have seen,

23   that we have been able to find.  Recently, in *Biden v.*

24   *Missouri* it's become very apparent that government

11:39:24   25   officials have been acting in nonpublic ways to pressure

Ruling of Court

1   -- to pressure private parties.

2       All we can say is that in this case, from the

3   publicly-available information, it is more than necessary

4   to satisfy the plausibility standard that is necessary at

11:39:37   5   this stage of the proceedings.

6       Unless the Court has any further questions.

7       THE COURT:  No, I don't.  I appreciate the -- the

8   issues are very interesting; and the briefing and the

9   argument has been very helpful to the Court.  And we'll

11:39:52   10   get a ruling out as quickly as we can for y'all.

11      MR. KELSON:  Thank you, Your Honor.

12      THE COURT:  All right.  The Court stands in

13   recess.

14      COURT SECURITY OFFICER:  All rise.

15      *(Proceedings concluded at 11:39 a.m.)*

16   *Date:  November 2, 2022*

17              ***COURT REPORTER'S CERTIFICATE***

18       *I, Laura Wells, certify that the foregoing is a*

19   *correct transcript from the record of proceedings in the*

20   *above-entitled matter.*

21              _____/s/ Laura Wells_____

22              *Laura Wells, CRR, RMR*

23

24

25